Chief Justice Marshall
delivered the opinion of the Court.
In the year 1835 JohnR. Nelson, having title to several valuable tracts of land in the county of Mercer, (now Boyle,) departed this life under the age of twenty-one years, unmarried and without children, or father, mother, brother, or sister, or their descendants, but leaving paternal and maternal kindred, among whom, by the 7th and subsequent sections of the statute of descents of 1796, (Stat. Law, 563,) the inheritance descended in equal moieties — that is, one moiety to the patei’nal and one to the maternal kindred, in the course pointed out by the 8th section and other following sections. And their being on the side of the father no grandfather, but a grandmother, two uncles and an aunt, each of these was entitled, under the 8th and 9th sections, to an equal portion of one half of the estate, that is, each to one eighth of the whole. And on the mother’s side there being neither grandfather nor grandmother, nor uncle, but one aunt, Mrs. Weisiger, and the children of a deceased aunt, Mrs. Edwards, the living aunt was entitled to one half of one moiety, that is one fourth of the whole; and the six children of the deceased aunt were entitled, collectively, to the same proportion. These children being infants, residing in the State of Illinois with their father, Cyrus Edwards, the Legislature of Kentucky by an act, approved January 21st 1837, authorized Cyrus Edwards, as natural guardian for his infant children, part of the heirs of John Reed Nelson, to file a bill against them in the Mercer Circuit Court, alleging certain fiicts, and authorized the Court, upon ascertaining the value of the lands, and if of opinion that the interest's of the children would be promo *496 ted thereby, to appoint said Edwards commissioner to sell, &c., at public or private sale, and not below the value fixed by the Court, and at such credits as the Court shall direct, the proceeds to be invested in lands in the State of Illinois. A petition or bill was accordingly filed in the Mercer Circuit Court, and upon the report of commissioners, as directed by the act, the value of the land was fixed at $35 per acre, and the Court being of opinion that it would be advantageous to the infants to sell their interest in this land and invest the proceeds in lands in the State of Illinois, as alleged in this petition and provided for by the act of the Legislature, appointed Cyrus Edwards commissioner to sell the same publicly or privately for not less than $35 per acre, on a credit of one and two years, with interest from the date of sale.
Lee’s contract •of purchase.
In December, 1837, shortly after this decree was rendered, it appears that by consent of the other heirs and of Cyrus Edwards, acting by his agent, John Green, the entire interest of the heirs of John R. Nelson in two adjoining tracts of iand, the one of about 900 and the other of about 75 acres, and forming together one tract, was, upon due advertisement, offered for sale at public out cry. This proceeding' was not regularly reported to the Court, nor is any precise account given of it in the record. But the result was probably embodied in an article of agreement executed on the 23d of December, 1837, a day or two after the public sale. This agreement recites the names of the grandmother, the two uncles, the husbands of the two living aunts, of John R. Nelson, and Cyrus Edwards, as parties of the first part, and George Lee of the second part, but does not describe the character or title of the first parties. It then states that the persons of the first part have sold to George Lee the tracts of land descended from John Reed Nelson, deceased, lying, &c., supposed to contain 975 acres, which constituted the plantation, &c. &c., to be paid for as follows : one third on the first day of Janaury next, (that is, January 1838,) or if not, negotiable notes, payble in thirty days, to be *497 executed to each of the persons interested; one other third on the first of January, 1839, and the other third on the first of January, 1840 — possession to be delivered the first of January, 1838, and the vendors were to have the land surveyed, and any excess or deficiency to be added to or deducted from the last payment. “The deeds to be made on or before the second payment, and the vendors may retain a lien,” &c. The concluding sentence of the agreement is in the following words: “It is understood the said Edwards sells under the powers vested in him by a decree of the Mercer Circuit Court and subject to the ratification thereof, and the first payment to him is not to be made until the said Court shall approve the sale here made, but it is to bear interest until made.”
The decree uncommissioner sold, &c.
The aot of 1843, made^by *&£ Qilea, aíattoíi aey>&0-ia 1837»
At the succeeding term of the Mercer Circuit Court, April 3d, 1838, an amended petition was filed stating more minutely the title and the situation of the three tracts of land referred to in the original petition, and without any notice of the intermediate proceedings, praying as before. Whereupon commissioners were directed to value the lands separately; and upon their reporting each tract to be worth $35 per acre, the Court on the 6th of April rendered a decree which set aside the former decree, “as no step has been taken under it,” and appointing Cyrus Edwards commissioner to sell by private contract or public out cry, conforms in all respects to the first decree, except that it does not require that interest shall be paid from the date of the sale. Each decree directs that in case of a sale by public out cry, advertisements be made in a manner prescribed, and that the commissioner shall give to the purchaser a certificate entitling him to a conveyance when the purchase money (to be secured by bonds payable to him) is paid.
Nothing further appears to have been done in Court until after the passage of an act, approved February 21st, 1843, to amend the former act. This amendatory act authorized the Mercer Circuit Court, upon a supplemental petition to be filed by Cyrus Edwards, to *498 ratify and confirm, so far as his infant children are concerned, the contract of the 23d of December 1837, made for them by said Cyrus Edwards, acting by John Green, his attorney in fact, and other heirs of John R. Nelson, of the one part and George Lee of the other part, provided the Court should deem the same advantageous to said infants, and authorizing a conveyance of their titles. But the act provides, that it (the act) is in no wise to affect any equity which he may have in the premises. Under this act a supplemental petition was filed by Cyrus Edwards in the name of his children in April 1843. And upon affidavits taken, the Court being of opinion that the contract of December 1837 was advantageous to them, a decree was rendered at the same term confirming the sale and authorizing a conveyance, stating the amount of purchase money received for them and retaining a lien for the residue, which deed was required to be made on or before the first day of the next regular term. At the succeeding regular term, (on the 6th of October, 1843,) a rule was made, on the petition of Lee, that Edwards show cause at the next April term why said Lee should not be made a party. No further proceedings seems to have been had in the case, which must be regarded as still pending.
The filing of the bill in- this case April, 1845, byHelson’sheirs for specific performance of the contiaet of sale to Lee,
But in April 1845 the heirs of John R. Nelson, including the infant children of Cyrus Edwards, who sue by him as their next friend, filed their bill against Lee asking for a specific execution of the contract of December 23d, 1837, averring their ability and readiness to fulfil it on their part, their desire at all times to do so, and the tender at different times of separate deeds from the heirs except the children of Edwards; and as to them, it sets forth the proceedings on the petition, as above recited, and avers that Cyrus Edwards delivered a certificate of purchase to Lee in 1838, and that under the decree on the supplemental petition in 1843, he tendered a deed conveying the title, which he refused, &c. It admits the receipt of the first instalment of the purchase money by all of the heirs, including *499 that payable for the interest of.the children of Edwards, and also a part of the second instalment, which, not having been fully paid or tendered, the complainants insist that they have not been in default in making the conveyance. They offer to perfect the deeds before tendered if they should be deemed defective, and insisting that they had a right to convey their respective interests by separate deeds, consent that the Court may decree a joint conveyance by a commissioner.
Lee’s onswex ¿¡crossbill,Noy. 1845.
In November 1845 Lee filed his answer, which he j i*n - . . - made a cross bill, praying for a recission of the contract. He says, in effect, that when bidding for the land, he supposed the whole was sold under a decree, but was afterwards informed that the interest of the children of Edwards alone was so sold, and that the interest of the other heirs was sold by their consent; that the agreement of December 23d, 1837, was executed by some of the parties of the first part in person, and by agents for others, and he does not know that they were authorized. Cyrus Edwards was not present at the sale; that the agreement was delivered to. him, and he held it as the only evidence-of his purchase; that he received the possession, as stated in the bill, and has paid, at different times, at least $21,871 50 of the purchase money, believing, while he was making said payments, that the contract would be carried out, &c. But that shortly afterwards he learned that a mortgage on the land, executed by the former proprietors, Davis and George Caldwell, &c., had been foreclosed in the Mercer Circuit Court for a large amount; and while examining the records to ascertain this fact, he also looked into the petition suit of Edwards, and to his surprise, found that his purchase had not been reported — -that a decree had been rendered for another sale, under which nothing was done — and that upon advice taken, the decree and all the proceedings were understood to be void. The statute had not been complied with — the children of Edwards had not been made parties — and he was informed that Anne K. Nelson, (paternal grandmother of John R. Nelson,) named as a *500 party to the agreement of sale, had previously conveyed her interest to Jeter Hicks (who was also a party)— that under these circumstances he determined to abandon the contract; and, although he still holds the land in possession, he has done so, regarding it as an indemnity. for his payments, which he expected would have to be principally reimbursed in that way. “The complainants, he thinks, were soon after apprised of his determination.” tie does hot admit the heirship of the complainants, as alleged, nor that they have title, &c., but says their title is defective and incumbered, and calls for their title papers and for proof of their right to convey; charges that they have been negligent in complying with their part of the contract, and that on that ground alone, a specific execution should be denied to them. He admits the tender of separate conveyances by some of them, which he refused to accept, on the ground that by the contract he was entitled to a joint deed and joint warranty, and he was not and is not willing to waive this right or to change the contract. He avers that when he became acquainted with the State of the title and of the proceedings, áre., and ever since he made it known in conversations — and it was kpown.to the complainants that he had determined to cancel the contract — that so far as Edwards was concerned, he considered it as already cancelled by the proceedings in the suit, (petition,) and he was unwilling to take a conveyance from the other heirs alone. He objects to the deeds tendered, because they are the separate deeds of the heirs, and objects also to a joint deed by commissioner, as proposed; and he admits his refusal of a deed tendered by Edwards under the decree on the supplemental petition. He says he was not aware, when he purchased, that there was any want of conformity between the sale and the decree; nor was he notified of the subsequent proceedings; that he is ignorant why the sale was not reported, and why it was stated of record that no sale had been made. He admits that a paper, purporting to be a certificate of purchase from Edwards alone, was tendered to- him late in *501 the year 1838, which he refused to accept as a part of the contract, because it did not correspond with the written agreement, and was untrue in its statements, but that he retained it to compare it with said agreement, and he refers to it as filed wdth his answer. In addition to the objection made to the proceedings under the statute, referred to in the bill, he insists that as Edwards and his children were and are residents of the State of Illinois and not citizens of Kentucky, the Legislature of Kentucky could not authorize the transfer of the title of the infant children — that the supplemental proceedings are void, and that if .valid the title is not such as by his contract he is bound to accept.
The decree of the Circuit Court rescinding the contract of purchase.
Where suit had. been brought to> foreclose a mortgage, & dismiss’d: for want of prosecution, & that dismissal long' acquiesced in,, the presumption arises that the mortgage was-paid off.
Upon final hearing, the Court, in conformity with the views and under the prayer of the defendant Lee, decreed a recission of the contract of sale, and directed proceedings for ascertaining the equities cf the parties consequent upon the recission, and decreed that the complainants pay the costs of Lee upon the original and cross-bills. To reverse this decree, the complainants have brought the case to this Court, and the two principal questions presented are, fiirst, whether the complainants have such title as the defendant should have been decreed to accept, or such as should have prevented a recission of the contract; and, second, whether there was and is an enforcible contract between the parties.
First, as to title in the complainants. It is proved that they are the heirs of John Reed Nelson, who, as the heir of his father, Samuel K. Nelson, and of his infant sister and co-heir, deceased, inherited and owned at his death, such title as his father held' in the entire tract of 975 acres. Mrs. Ann K. Nelson’s interest either passed by her deed, or descended to her heirs, who are complainants. The title to 900 acres, derived by purchase through the Caldwells, appears to be perfect, except so far as it may be encumbered by the mortgage and proceedings thereon, referred to in the answer and cross-bill of Lee. From these proceedings, which are made a part of the record before us, it ap *502 pears that after the mortgagees had, with great zeal and pertinacity, pursued their remedies for foreclosure for many years, after several decrees had been rendered, preparatory to a sale of the land, for the satisfaction of several large debts, ascertained to have liens upon it under the mortgage, and when the fruits of a long and expensive litigation seemed- to be just within their grasp, the entire suit was dismissed (several years before the present bill was filed) for want of prosecution. The natural and only rational presumption is, that when it was determined that the land was subject to the demands claimed to be secured by the mortgage, the debts were paid, or otherwise arranged so as to leave the land free from encumbrance; and if it might have been improvident to decree a specific execution on the ground of this presumption alone, we think it certainly would have been improvident, in the absence of any rebutting circumstances, to decree a recission on the ground of a continued encumbrance by the mortgage. It might be prudent, in such a case, to direct an enquiry, by the master, to ascertain the condition of the mortgage claim, which, even if not extinguished, might be actually within the amount of purchase money remaining unpaid, and therefore not of itself sufficient to authorize a recission or to prevent an enforcement of the contract of sale. But a long acquiescence in the dismissal of the suit on the mortgage would seem to authorize the assumption that the encumbrance no longer existed.
Before the statute authorizing the sale of infants land devised, land descended was sold and conveyed by decree of the chuncellor, the price received by the infants at full age, and the sale acquiesced in for 25 years: Held that the title was valid. One of the devisees being a feme covert, and having interestof 143d part not conveyed--a purchaser might ask an abatement to that extent.
*502 With respect to the 75 acres, constituting a distinct part of the 975 acre tract, no particular allegation nor specific objection is made in the pleadings. It appears however, from a record filed in this case and read on the trial, that in December 1825, the 75 acres were purchased by Samuel K. Nelson at a decretal sale upon the petition of two infant children and devisees of David Knox, by their guardian, and that a conveyance, by commissioner,was shortly afterwards made to him and approved by the Court. There is no objection to the title of Knox, which seems to be indisputa *503 ble. The objection is that this land did not descend to the heirs of Knox, but was devised to them, as appears by his will; at the date of this petition and sale there was no authority in the Courts to decree a sale of land on such a petition unless it had descended. But this objection, however well founded in principle, is, to a great extent if not wholly, obviated by the fact that the proceeding was assented to and authorized by most of the heirs besides the petitioners — that several of them answered, and some of them made purchases under the decree — that all received their portions of the proceeds of this land, and that all have acquiesced in the sale made about twenty-five years ago. One and but of the eleven children, &c., heirs of Knox was a female then and still under coverture, she, therefore, may not be estopped or otherwise barred. But we are of opinion that, under the circumstances stated, the assent and authority of the other ten heirs must be presumed, and that after so great a lapse of time they are precluded from the operation of any right in opposition to the sale. The interest of the feme covert, Mrs. Caldwell, in the 75 acres, being only about six acres and eight tenths, and less than the one hundred and forty-third part of the 975 acres embraced in the contract, its actual loss would not be a proper ground either for rescinding the contract, or refusing a specific performance. But, in the abscence of any conveyance from her, their might either be a rateable abatement in the price, or some other provision for the indemnity of Lee against any claim on her part.
Second. As under the foregoing views the decree cannot be sustained on the ground of a defect of title in the complainants, we proceed to consider the question whether on the facts stated there was and is any enforcible contract between the parties. In entering upon this branch of the subject, it is to be recollected that the written articles, signed by the parties, discriminates between the apparent vendors and their interests by stating that Cyrus Edwards was selling not for himself, but under a decree and subject to the rati *504 fication, and of course to the disaffirmance of his acts by the Court, and the first payment to him was to be postponed until the sale should be approved. Lee knew he was purchasing from Edwards the interest of his infant children, and that his purchase was, to this extent, subject to the future action of the Court. It was his duty to know what the decree was, and to notice the future proceedings by which his interest and duty were to be affected. Then, although Edwards appears in the first part of the instrument as a joint vendor, or with the others, does not the last clause show that, as to him and the interest which he was disposing of, that the sale was distinctly made in a special character, subject to special contingencies, and requiring special provisions, applicable as between him and Lee alone, and which might separate the mutual performance of the contract, as between them, from its performance, as between Lee and the other vendors? Edwards was not entitled to demand any payment until the ratification of his sale. But there was no condition to the right of the other vendors to have the first payment, and no condition as to the other payments but the general condition applicable to all, that the deeds should be made on or before the second payment. And we remark that the word deeds, in the plural, (for such it appeal's to be both in the transcript and in the original papers,) demonstrates that the execution of the contract, on the part of the vendors, was not necessarily to be One joint act, and thus authorises the conclusion, not only that Edwards might, but that in reference to his character as commissioner, it was expected that' he would convey by .separate deeds.
Assuming that under the joint terms of sale, contained in the first part of the writing, all the vendors were bound for the conveyance of the title to the entire tract, it does not follow that they were bound for a joint conveyance by one deed, or that the conveyance of the entire tract, or the ability to convey it, was a condition precedent affecting the entire right of execu *505 ting and enforcing execution of the contract. And under the discrimination made, with reference to the interest sold by Edwards, we are inclined to the opinion that there was a binding contract enforcible as to the other interests, .amounting to three-fourths of the land, independently of the ability of Edwards to convey the fourth part sold by him; and that although by subsequent events he should be entirely unable to do so, the residue of the sale might be enforced, unless it appeared that there was some unfairness or imposition in the transaction, or that the acquisition of the interest which Edwards assumed to sell was so material an inducement to the purchase, that-the enforcement of the contract, as to the residue upon the stipulated terms, would be an evident hardship and injustice, and that the loss of this particular interest could not be reasonably compensated in damages.
It is true all the vendors have been bound for what is .implied in the statement that Edwards sells -under the powei's vested in him by a decree and subject to ratification. And under this implication -they may have undertaken that the sale by Edwards, which was in fact made under the powers conferred by'the decree, was such as was capable of ratification by the Court. But it cannot be supposed .that they undertook that the sale was in exact conformity with the decree under which it was made, since the discrepancy, with respect to the terms of payment, was apparent. They could not have been bound by this statement further than that the sale was susceptible of ratification. They did not by this clause undertake that the sale should or would be ratified. And the most unfavorable construction to the vendors that can be put upon the entire article, is, that if the sale by Edwards was not susceptible of confirmation or ratification by the Court — that is, if it was absolutely void either for want of conformity with the decree, or for want of power in the Court to authorize or confirm it, this defect vitiated the entire sale and rendered the whole either absolutely void, or at least voidable at the option of the vendee»
The general power of the Legislature to authorize decrees by the Courts for the sale of infants estate has been too long practiced & acquiesced in to be bow questioned.
If this sale by Edwards were thus void, there was of course no enforcible contract to that extent, and any subsequent proceedings to which Lee was not a party, could not make a contract binding on him. . But if the sale was not void, but was susceptible of ratification, its subsequent ratification by the competent tribunal was binding on Lee, who bought knowing that the sale required such ratification — who had opportunity of knowing the proceedings taken for procuring it, and who cannot resist the enforcement even of this portion of the contract on account of the tardiness and indirectness of these proceedings, unless he shows that he was injured thereby, or that the delay was caused by a desire to profit by contingencies, which might make the sale desirable or otherwise, and, in fact, that there was what is called a trifling with the contract. Nothing of this sort being shown, it is not necessary to decide how far. the residue of the contract and the other vendors might have been affected by such facts had they existed. Whether, if the sale by Edwards had been absolutely void, the residue of the sale, would also have been ipso facto void, is, to say the least, exceedingly doubtful. 'But as this question arises only upon the assumption that the sale by Edwards was void, we do not decide it, but pass to the question on the sale by Edwards.
The general power of the Legislature to authorize the sale of the land of infants, through the agency of a Court or judicial tribunal is admitted in argument, and cannot at this day be questioned. It has not only been-long exercised, but many titles derived under such sales have passed through and been held valid by this Court, and numerous estates comprising vast quantities of land have been acquired and are held under this joint sanction of the legislative and judicial departments. If the power were originally questionable, it is now too late to question it. The disabilities of infants and the powers of guardians over their estates, are matters of legislative regulation. The actual disability and impotency of infants of tender years to'take care either of *507 themselves or their estates, subjects, necessarily, both themselves and their property, tó some extent, to the care and power of others, and thus the whole subject is brought within the proper sphere of regulation by the public authority, which, from the necessity of the case, must be competent to determine the rights both of infants and their guardians. And as there may be emergencies which require the exercise of the same power over an infant’s property which an adult may exercise over his own, it would seem that the legislative authority should be competent, both to determine the nature of the emergency which would require such acts on the part or in behalf of the infants, and to invest either the infants themselves or some other person or tribunal with the power of performing them. We perceive no ground for limiting this public authority to the personal estate of infants, although the difference between the different sorts of property furnishes a proper ground for caution, and for discriminating between the emergencies which may be deemed sufficient for the exercise of the power with respect to the one or the other species.
Thé Legislature of Kentucky have the power to authorize the Courts to decree the sale of the land of non-resident infants, <s ofresidents — our statutes apply to both.
Then is there any ground for discriminating between the legislative authority over the lands of infants, on the ground of the owners being or not being residents of the State? It is true the persons of the non-resident infants are not within the jurisdiction of the State, and the powers and duties consequent upon their personal presence do not attach. But their lands are here, subject to the jurisdiction of this State and of no other, and the interests of the non-resident owners in these lands is subject to the jurisdiction of this State, which is bound to protect those interests, and which in the case of non-resident infants, does protect them by authorizing the appointment of guardians to preserve and control their lands within the State. The same emergencies may exist in the case of non-resident as of resident infants, requiring the exercise of the same power over their estates, to be exercised either by themselves or by others for them. And, although, as the Legisla *508 ture is not so directly bound to regard their personal comfort arid convenience or advantage as if they were residents, it might refuse altogether to confer the powers ncessary for their advancemet, we do not perceive that the fact of non-residency diminishes the power of the Legislature or the public over their estate situated within this Commonwealth. If it were even conceded that the persons of the non-resident infants being out of this jurisdiction, the Legislature could not confer on them a personal power of selling their lands here before attaining full age, as fixed by the general laws, which we do not decide, it would by no means follow that the guardians of non-resident infants might not be invested with the same pow;ers over their lands situated here, as are conferred upon the guardians of resident infants, to be exercised in the same emergencies and under the same restrictions. On the contrary, we are not only satisfied that this may be done, but we are further of opinion, that the fact that the infant owner of land's within this Commonwealth is a resident of a distant State, may constitute a sufficient and proper ground for conferring the power of selling his lands here, if desired by those who may be safety recognized as the guardians of his interest, and under proper cautions for its ascertainment and security. Our general statutes authorizing the sale of infants’ lands, on the petition of their guardian, makes no discrimination between resident and non-resident infants, and, as we presume, was intended to apply to both. The constitutionality of these statutes, if even questioned, is well established. Under them a sale upon petition by the father, as natural guardian, has been sustained by this Court, but since the enactment of the particular statute now in question: McKee’s heirs vs Hann, &c., (9 Dana, 526.) And whether the fact of the infant owners being non-residents or about to become so, might or might not be regarded, even under the general statute, as a proper ground for decreeing a sale, we do not doubt that the Legislature may make it a sufficient ground for the action of the Courts. And although the general statutes *509 may contemplate a public sale and not a private sale under the decree, this is a matter of expediency and prudence, certainly within the power of the Legislature, if not within the discretion of the Courts under the general statutes.
It was competent for the Legrislatuxe to pass a law authorizing the guardian' of non-resident infants to petition, and a Court of Chancery to decree the sale ot the land of such infants without process against the infants.
*509 We conclude, therefore, that the statute authorizing the original proceeding by Cyrus Edwards, as father and natural guardian of his children, is constitutional and valid. And as we are of opinion that the power thereby conferred on the Mercer Circuit Court was not exhausted by the first decree of sale, but that the Court, upon being satisfied that a sale could not be made on the terms decreed and that the land was not worth so much, might either have confirmed the sale under the first decree, although somewhat variant from it, or might have decreed a second sale, we cannot regard the actual sale as being void. But as it was made fairly and publicly upon general notice, and the attendance of bidders, and was, moreover, concurred in by the adult owners of three-fourths of the land sold, and evidenced by written articles signed by the parties, we think there was sufficient evidence that it was an advantageous sale, and sufficient ground for its confirmation, if the facts had been reported to the Court as they should have been. There was, therefore, a sale and contract for the whole tract, not void as to any part, and which, although voidable, ought not to have been, and as we must presume would not have been, avoided or disaffirmed by the Court. Under this contract Lee, as well as the vendors, acquired rights which ought not to have been disregarded. He might, as purchaser, have compelled a report or certificate of the sale, and we assume that the Court would have protected his interest, if properly presented, and would have authorized and enforced a completion of the sale upon the terms on which it was made.
It is argued, that as the statute authorized Edwards to file a bill against his infant children, stating the facts, it was intended by the Legislature that they should be proceeded against in the usual manner of suits against *510 non-resident infants by warning order, and traverse or answer by guardian ad litem. But the jurisdiction of the Court and its power to decree a sale, did not depend upon these formalities, but upon the filing of the bill or petition by Edwards, as father and natural guardian, against his children, and stating the fact of their residence in Illinois which is undisputed, and that it would be for their interest to invest in that State the price or proceeds of their lands here, as to which, the Court was to form its own opinion upon the report of commissioners. A formal denial of either of these facts could have produced no other effect than a little additional expense and delay. And if the omission of the steps referred to may have rendered the proceeding erroneous, it did not, in our opinion, render it void, as was in effect decided in the case of Gates, &c. vs Kennedy, (3 B. Mon. 167,) under the general statute of 1836, authorizing the sale of lands devised to infants, and which required them to be made parties. We suppose the Legislature did not contemplate nor intend to provide for a controversy between Edwards and his children with regard to what would be advantageous to the latter, but intended to confer a power upon him under the direction and judgment of the Court, to act for them in the case provided for. The proceeding was, doubtless, intended to be modeled, substantially, upon that authorized by the general statutes, and we think no particular stress is to be laid upon the words “bill against his children,” as intended to vary the proceeding, substantially, from that by petition under the general statute. It may have been intended to give the children the right of appeal, &c., as formal parties, but not as, we think, to make the power of sale depend upon the form of proceeding,- after filing the bill, which gave jurisdiction of the case. And, as in the case of Gates vs Kennedy, supra, the present bill filed by the children of Edwards with other vendors, while the proceedings on the former bill were still pending and incomplete, may be considered as causing whatever irregularity there was, in not proceeding formally against *511 them as defendants to the first bill, as well as other in-formalities, and especially, as during the pendency of the present bill, several of them have become adults, and all insist on the completion of the sale.
Infants whose lands have been sold by a decree of the Chancellor under a statute may, on arriving at full age, waive an irregularity as to them selves, and insist upon a specific performance .by the purchaser.
*511 Under any view of this objection it does not, in our opinion, prove the sale to have been void, but leaves it subject to confirmation or disaffirmance by the Court. And as it was in fact afterwards confirmed by the Court before the present bill was filed, and is prayed to be carried into effect by all of the vendors, who, whether infants or adults, would be bound by a decree granting their prayer; and as the vendee has remained in quiet and undisturbed possession during the long interval of thirteen or fourteen years since the sale, taking no step himself for having it acted on by the Court until he filed his answer in this case, and suffering no injury from the delay, the only remaining questions seem to be whether the sale was, at any time, by disaffirmance or other act of the Court actually nullified, so as to be no longer capable of confirmation, or whether it was so treated by the other parties as to preclude them from enforcing it against Lee.
It is not alleged that there was any other disaffirmance by the Court but such as is implied in the second decree, which set aside the first and directed a sale, reciting that there had been none. But there' was nothing done under the second decree. It might at any time have been set aside or disregarded. And neither the purchase under the first, nor the infant children, for whom the sale was made, could be deprived of their rights by this indirect assertion of a fact which did not exist. The sale under the first decree, not having been brought before the Court, there was no decision against its validity; and the second decree showing that the fact of a sale having been made was not known to the Court, presented no obstacle to its confirmation, and, especially, so long as nothing was done to create a counter interest under the second decree.
With regard to the motives or purpose of Edwards, or those who were controlling the proceedings for him, *512 we think there can be little doubt. There is not the slightest ground for supposing that any of the vendors desired or intended to defeat the sale to Lee, which they seem in every act unless it be the second decree, to have desired to carry out. And we might infer that it was intended in the form of a sale, under the second decree, to give effect to the sale actually made under the first, and that the certificate of sale sent by Edwards to Lee, was intended to evidence such second sale, though it dates the sale a few days before the decree. That it was not intended to disregard the actual sale, and sell the land again, is evident from the fact that, although the second decree directed a sale, none was attempted. And we regard this intermediate proceeding as an awkward effort to cure the discrepancy between the first decree and the sale made under it, which, as it produced no real injury except that of delay and embarrassment to the vendors, is entitled to no effect upon the the question of recission or specific execution.
It was certainly the duty of the vendors, or at least of Edwards, to have had the sale confirmed in reasonable time, but Lee having remained in the enjoyment of the land, having, as we understand the facts, continued to make payments after the time when the second instalment was to have been paid, and the deeds made, and not having made known any objection to the fulfilment of the contract, until some indefinite period afterwards, and .the confirmatory act and decree having been obtained before he took any formal steps for rescinding the contract, we are of opinion that he cannot rely upon the mere delay in confirming the sale, and that having sustained no injury by it, he should be compelled to perform his part oí the contract by payment of the balance of the purchase money, (due for the full quantity of the land which should be ascertained or agreed .on,) except so far as his duty, in that respect, may, upon the principles formerly stated in this opinion, be affected by the mortgage, above referred to, or by the want of title, as to the interest of Mrs. Caldwell in the 75 acres claimed by the complainants as de *513 lived from Knox, as to which, proper provision for his security may be made in the decree. And as the complainants have offered to execute a joint deed by a commissioner under the decree of the Court, such a deed should be decreed accordingly, in addition to which, .Lee should be permitted to accept the deed tendered by Edwards under the confirmatory decree, and also such of the other deeds tendered by the other parties, respectively, as he may choose to take, conceiving as we do, that the Court had power without-the confirmatory statute to confirm the sale, we have not deemed it necessary to comment upon that statute.
Harlan and Bell for plaintiffs; Foxand Kincaid for defendant.
Wherefore, the decree is reversed, and the cause remanded for a decree as above indicated.